UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| Celestin Glenn Tappin, Jr.,<br>Petitioner,<br>v.<br>Warden Frazier,[1]<br>Respondent. | Case No. 3:22-cv-00570-ART-CSD<br>MERITS ORDER |

In Celestin Glenn Tappin, Jr.'s 28 U.S.C. § 2254 First Amended Habeas Corpus Petition he challenges his state court convictions, including for attempted murder, arguing that his trial counsel was ineffective. (ECF No. 21.) Because the Court concludes that Tappin's claim lacks merit, the Petition is denied.

## I. Background

In April 2017, in Second Judicial District Court (Washoe County), Nevada, a jury convicted Tappin of battery with a deadly weapon causing substantial bodily harm, mayhem with a deadly weapon, and attempted murder with a deadly weapon. (ECF Nos. 22-45 through 22-47.) Tappin was found guilty of attacking his best friend Donnie Wilson with a machete. (*See* ECF No. 21.) In December 2016, Reno police responded to a report of a family disturbance. They found Tappin standing in front of his father's house; his parents were standing in the doorway. He had blood on his feet, legs, hands, and sweatshirt, and appeared intoxicated. Tappin's mother made comments that led police to another

[1] According to the state corrections department's inmate locator page, Tappin is incarcerated at Southern Desert Correctional Center. The department's website reflects that Manuel Portillo is the warden for that facility. https://ofdsearch.doc.nv.gov/form.phpAt the end of this order, the Court directs the Clerk to substitute Manuel Portillo for prior Respondent Warden Frazier under, *inter alia*, Rule 25(d) of the Federal Rules of Civil Procedure.

residence where they found Wilson covered in blood with severe lacerations, apparently near death. A machete was on the floor of a hallway. DNA recovered showed Wilson's profile from swabs of Tappin's hands and feet, and Wilson as a major contributor to the DNA found on the machete and Tappin as a minor contributor.

The state district court sentenced Tappin to an aggregate term of 16-40 years in prison. (ECF No. 23-6.) Judgment of conviction was entered on September 7, 2017. (ECF No. 23-7.) The Nevada Supreme Court affirmed Tappin's conviction, and the Nevada Court of Appeals affirmed the denial of his state postconviction habeas petition. (ECF Nos. 23-26, 24-22.)

Tappin dispatched his federal habeas petition for mailing about December 31, 2022. (ECF No. 6.) The Court granted his motion for counsel. (ECF Nos. 5, 7.) He filed an amended petition through counsel raising a single ground:

> <u>Ground 1</u>: Trial counsel failed to object to the admission of a recorded conversation between law enforcement and the victim in violation of Tappin's Sixth Amendment rights to effective assistance of counsel and confrontation.

(ECF No. 21 at 7-12.)

Respondents have now answered Tappin's claim, and Tappin replied. (ECF Nos. 41, 46.)

## II. Trial Testimony[2]

Reno Police Department ("RPD") officer Christopher Johnson testified that he responded to a call the night of December 21, 2016, at a house near downtown Reno. (ECF No. 22-41 at 168-219.) Three people were standing outside; Johnson identified Tappin in court as one of them. Tappin had red staining on his feet, arms, and sweatshirt. Tappin was calm but smelled of alcohol; his speech was

[2]This Court makes no credibility findings or other factual findings regarding the truth or falsity of this evidence from the state court. This Court's summary is merely a backdrop to its consideration of the issues presented in the First Amended Petition.

somewhat slurred, and his eyes were red and watery. Johnson asked Tappin what had happened to his feet; Tappin said he'd stubbed his toe. The other two people there were Tappin's parents. Based on the parents' comments, Johnson, Officer Kiechler, and Tappin's mother went to the nearby house where Tappin lived with Donnie Wilson. Several officers entered the house and found Wilson crumpled in a corner against the wall covered in blood. He appeared to be dead. There was blood all over the house including on the floor and ceilings. A machete lay nearby. Johnson identified the machete in court; "Chopper" was written on its side. When Wilson suddenly called out, "I'm cold. I'm cold," officers realized that he was alive. (*Id.* at 187.) Wilson was taken to the hospital and was in critical condition with multiple lacerations to his head, face, and extremities, and a fractured skull.[3] It was later determined that he had a blood alcohol count over twice the legal limit.

Officer Christopher Rose responded to Tappin's father's house. (ECF No. 22-42 at 34-51.) When he escorted Tappin to his police vehicle, he saw that Tappin had blood on his right foot and calf, and what appeared to blood splattered on his clothing and hands. Rose brought Tappin to the police station and put him in the detective holding room. As Rose was leaving the room Tappin said, "No face, no trial." (*Id.* at 41.) The blood on Tappin's legs and feet and on the machete were later determined to match Wilson's DNA.[4]

Tappin's mother Janice Dehart testified at the preliminary hearing that Wilson and Tappin lived with her at her house. (ECF No. 22-1 at 43-66.) The night of the incident she was at her ex-husband's house when they woke up to Tappin blowing his car horn outside. He said something happened to Wilson and

[3] *See, e.g.*, testimony of emergency room doctor Eric Sanders. (ECF No. 22-42 at 177-196.)

[4] *See, e.g.*, testimony of Washoe County Sheriff's Office criminalist Monica Siewertsen. (ECF No. 22-42 at 111-156.)

he needed to use the phone because he didn't have one. Dehart said that Tappin told her that he had been sleeping in her room when something woke him up. He went out to the front room where Wilson had been watching TV and found Wilson in a pool of blood. Tappin stepped in the blood as he was trying to help Wilson. Then Tappin left to call an ambulance. Dehart did not recall telling an officer that Tappin had mentioned something about a murder at her house. She said at the time of the hearing she and Wilson were living at her house, though earlier Wilson had stayed with her ex-husband because it looked like Tappin might be released from custody.

## III. Discussion

### a. Legal Standards

#### i. AEDPA Standard of Review

28 U.S.C. § 2254(d)[5] sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in

---

[5] Tappin states that 28 U.S.C. § 2254(d) is unconstitutional. (ECF No. 21 at 6.) Tappin acknowledges that the Ninth Circuit has previously rejected a constitutional challenge to 28 U.S.C. § 2254(d). *See Crater v. Galaza*, 491 F.3d 1119, 1129 (9th Cir. 2007) ("The constitutional foundation of § 2254(d)(1) is solidified by the Supreme Court's repeated application of the statute."). And the Supreme Court has recently confirmed AEDPA's constitutionality. *See Brown v. Davenport*, 596 U.S. 118, 127 (2022) ("When Congress supplies a constitutionally valid rule of decision, federal courts must follow it. In AEDPA, Congress announced such a rule."). The Court, therefore, rejects Tappin's constitutionality challenge.

the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

To the extent that the petitioner challenges the state court's factual findings, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *See, e.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a mere showing that the state court finding was "clearly erroneous." *Lambert*, 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

### ii. Ineffective Assistance of Counsel

Ineffective Assistance of Counsel (IAC) claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing *Strickland*, 466 U.S. at 687). To establish ineffectiveness, the defendant must show that counsel's representation fell below

an objective standard of reasonableness. *Id.* To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id.*; *Mann v. Ryan*, 828 F.3d 1143, 1160 (9th Cir. 2016).

Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id.*

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted). When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires a petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.*

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as

"doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id.* at 1403 (internal citations omitted). Moreover, federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-84. The United States Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.* at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at 123. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 124. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (internal quotations and citations omitted).

**b. Analysis**

**Ground 1**

Tappin contends that his trial counsel was ineffective when counsel failed to object to the admission of a recorded conversation between the victim and law

enforcement in violation of Tappin's right to confrontation. (ECF No. 21 at 7-12.) A detective made the recording when he spoke with Wilson at the hospital.

The Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees criminal defendants a full and fair opportunity to cross examine the witnesses against them. "[A] primary interest secured by [the Confrontation Clause] is the right of cross-examination." *Douglas v. Alabama*, 380 U.S. 415, 418 (1965). While "the Confrontation Clause guarantees an opportunity for effective cross examination," it does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (internal quotation marks omitted); *see also Kentucky v. Stincer*, 482 U.S. 730, 739 (1987) ("[T]he Confrontation Clause's functional purpose i[s] ensuring a defendant an opportunity for cross-examination."). Regarding out-of-court statements admitted at trial, the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 59 n.9; *see also Tennessee v. Street*, 471 U.S. 409, 414 (1985) ("The *nonhearsay* aspect of Peele's confession—not to prove what happened at the murder scene but to prove what happened when respondent confessed—raises no Confrontation Clause concerns." (emphasis in original)).

As Tappin's trial was starting, the prosecutor informed the court that the victim, Wilson, had overdosed and was in the hospital on an involuntary hold. (ECF No. 22-41 at 6-20.) Wilson had yet to be released as the State was finishing the presentation of their case. Because Wilson was unable to testify, the prosecutor then introduced Wilson's preliminary hearing testimony. (ECF No. 22-43 at 15-51.) Wilson had testified that a man named Robert had been living with them at the house but Tappin had asked him earlier that day to move out.

(ECF No. 22-1 at 8-42, preliminary hearing transcript.) Tappin and Robert had argued about it. Sometime not long before the attack on Wilson someone had "jumped" Tappin across the street from the house and he spent a week in the ICU. Wilson had not heard Tappin and Robert argue on the night of the incident. Wilson said that that night Tappin said he had a headache and was going to go into his mom's room and go to bed. Wilson stayed up hanging out. About half an hour later he heard a knock or a sound at the front door. He opened the door, and that is all that he remembers until he woke up in the hospital. He and Tappin hadn't argued. He said that when he woke up in the hospital a nurse told him that it was in his records that Tappin had caused his injuries.

The prosecutor then asked Wilson several specific questions about a recorded interview that a detective had with him within a couple of hours of the attack. (*Id.* at 27-29.) Wilson insisted that he "100%" didn't remember telling a police officer that Glenn Tappin injured him or that they had been arguing. (*Id.* at 27.) He said he did not remember telling the officer that his brother grabbed a machete and struck him numerous times. When asked why his preliminary hearing testimony was different than what he said to the officer, he said he didn't know.

At trial the State called RPD Detective Andrew Barba to testify and introduced the recording he made of his interview with Wilson at the hospital that Wilson testified at the preliminary hearing he did not recall. (ECF No. 22-43 at 51-74.)[6] Barba hadn't been to the crime scene and had little information.

[6] With the reply in support of his Petition, Tappin manually filed the recorded interview. ECF No. 48, Pet.'s Exh. 2.) Respondents filed a Motion to Strike the exhibit because Tappin did not present the recording to the Nevada Court of Appeals as part of the state district court record when he appealed the denial of his state postconviction habeas petition. (ECF No. 49.) Respondents argued that this Court may not consider the recording. *See Shinn v. Ramirez*, 596 U.S. 366, 382 (2022); *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011)). But those cases are inapposite; they govern whether a federal habeas court may consider evidence beyond the state-court record. Here, the recording was introduced as an exhibit at trial. (*See* ECF No. 22-3 at 23 (Exh. 46).) Federal habeas

Barba said Wilson was difficult to understand at times because his lower lip was severely lacerated—“almost hanging off his jaw”—but Wilson was lucid and would correct Barba if Barba misunderstood what Wilson was saying. (*Id.* at 54.) Barba testified that “When I said the wrong location, he would correct me, said the wrong name, he would correct me.” (*Id.* at 54-55.) Wilson said that he and Tappin were arguing at the house, and Tappin attacked him with a machete. At other points in the recorded statement Wilson also said that he didn’t know what happened. On cross-examination Barba said that he “absolutely” thought that Wilson’s statements to him at the hospital were reliable. (*Id.* at 63.)

Barba had also previously testified at the preliminary hearing that Wilson had been lucid at the hospital when Wilson told him that he and Tappin had argued and that Tappin attacked him with a machete. (ECF No. 22-1 at 67-84.) Barba said he had no prior knowledge of the perpetrator or alleged perpetrator before he spoke with Wilson and that it was Wilson who first told him that it was Tappin who attacked him.

During closing arguments, defense counsel commented on Wilson’s statements to the detective after the attack:

> Now, Mr. Wilson’s statement, you get to decide whether or not that was reliable. And was it? I think it’s suspect that the interview starts as, “Hey, Donnie, what were you trying to tell me?” Well, what – what started – what was said before this? Was [Tappin’s] name mentioned at all? We don’t know and never will. And the statement was taken minutes away from his operation. So he’s on morphine – or pain medication, excuse me, under the influence of pain medication. You’ve heard he’s under the influence of alcohol. A [blood alcohol content] of .18. That’s almost triple the legal limit. That, with pain medication, having lost a lot of blood, and you can assume that he lost a lot of blood because you can see it all over the house. We don’t know if he was on methamphetamine or heroin because nobody tested, nobody sought answers to see if he was

---

courts may consider the entire state court record, regardless of what was presented to state appellate courts. *McDaniels v. Kirkland*, 813 F.3d 770, 780 (9th Cir. 2015). So the Court denies the Motion to Strike.

> tested. But that would have been important. All of these things are what contributed to Mr. Wilson's delusions within that statement. "I don't know. I don't remember." How many times? 11. 11 times he says, "I don't know. I don't remember."
>
> He also says he was hit on the back of the head. There's no evidence that he was hit on the back of the head. The officer on the stand testified that he took photos of all of the injuries. He didn't take photos of the back of his head. The doctor said – we didn't hear any evidence from [a] doctor that he was hit or had an injury to the back of his head.

(ECF No. 22-49 at 38-39.)

The Nevada Court of Appeals concluded that counsel was not ineffective:

> …Tappin claimed that counsel were ineffective for failing to object to the admission at trial of a recording of an interview between the victim and a police officer that occurred shortly after the attack. Tappin claimed the introduction of this recording violated his confrontation rights because the victim did not testify at trial and was not cross-examined regarding the recording at the preliminary hearing. The district court found that counsel had a strategic reason for not objecting to the recording because the recording included exculpatory statements made by the victim, and counsel used these statements in their closing argument to the jury. Further, the district court found that there was no reasonable probability of a different outcome at trial had counsel objected and been successful. Evidence at trial showed that Tappin had the victim's blood on his hands and feet, Tappin's DNA was on the machete used in the attack, and Tappin made an incriminating statement to the police: "No face, no trial." Substantial evidence supports the decision of the district court, and we conclude the district court did not err by denying this claim without first conducting an evidentiary hearing.

(ECF No. 24-22 at 4-5.)

The Nevada Court of Appeals reasonably concluded that counsel was not deficient and that Tappin was not prejudiced. During closing arguments, the prosecutor indeed pointed to Wilson's statement to Detective Barba that it was Tappin who attacked him. (ECF No. 22-49 at 6-29.) The prosecutor also emphasized that when Tappin first encountered police at his father's house his explanation for being covered in blood was that he stubbed his toe, he never told

them that his brother was injured and needed help, and he later commented "no face, no trial." (*Id.* at 16.)

At the preliminary hearing the State questioned Wilson and Detective Barba specifically about the recorded statement and the discrepancies with the statement and Wilson's preliminary hearing testimony. And defense counsel cross-examined Wilson and Barba at the preliminary hearing. At trial defense counsel emphasized in closing arguments that the detective did not evaluate Wilson's ability to accurately report what had happened—he was obviously severely injured—and the detective didn't know if he was on pain medication or whether he was under the influence of drugs or alcohol. Counsel also highlighted that in his hospital statement Wilson repeatedly responded to questions by saying that he didn't know or didn't remember. So it was reasonable for the state appellate court to conclude that defense counsel strategically decided to highlight Wilson's equivocation, lack of memory at times, and seriously traumatized state at the hospital.

Moreover, Wilson's blood was on Tappin's hands, legs, feet, and clothing. Both Wilson's and Tappin's DNA were on the machete. Tappin said nothing to responding officers about Wilson being injured. He did, however, remark to an officer that if they had no face, they had no trial. Even if the Court assumed that counsel was ineffective for failing to object to the introduction of the recorded statement as a violation of Tappin's confrontation rights, there was no reasonable probability of a different result at trial. *See, e.g.*, *Flournoy v. Small*, 681 F.3d 1000, 1006 (9th Cir. 2012).

Especially considering the doubly deferential review of *Strickland* in tandem with § 2254(d), Tappin has not shown that the Nevada Court of Appeal's decision on federal ground 1 is contrary to, or involved an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the

facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). The Court denies habeas relief on ground 1. So the Petition is denied in its entirety.

## IV. Certificate of Appealability

This is a final order adverse to the petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability (COA). Accordingly, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

Having reviewed its determinations and rulings in adjudicating Tappin's petition, the Court finds that none of those rulings meets the *Slack* standard. The court therefore declines to issue a certificate of appealability for its resolution of Tappin's petition.

## V. Conclusion

It is therefore ordered that the First Amended Petition (ECF No. 21) is denied.

It is further ordered that a certificate of appealability will not issue.

It is further ordered that Respondents' Motion to Strike (ECF No. 49) is denied.

The Clerk of Court is directed to: (1) substitute Manuel Portillo for Respondent Warden Frazier; and (2) enter judgment accordingly and close this case.

Dated this 15th day of September 2026.

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE